[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION I. INTRODUCTION
This matter comes before the court on the Motion to Dismiss the Petition for Commitment of Calvin Long, (acquittee)[1], and a Motion to Strike the Report of Psychiatric Security Review Board (Board). On March 12, 2002, this court denied the acquittee's motions and extended the commitment of the acquittee pending the filing of a memorandum of decision. Upon further review, THE ORDER OF MARCH 12, 2002, IS HEREBYVACATED. The acquittee claims that General Statute § 17a-593 (c), which allows the state to petition the court to extend the commitment of an individual who was acquitted by reason of mental disease or defect beyond the maximum period of confinement set out in General Statute § 17a-582 (e)(1)(A), is unconstitutional. The acquittee makes three claims. The first claim is that the statute violates the Connecticut constitutional protections of substantive due process under Art. I, § 8 by failing to provide the committed acquittee with periodic judicial review of the confinement, as required under Fasulo v. Arafeh,173 Conn. 473, 378 A.2d 553 (1977). The second claim is that the statute violates the principles of equal protection under federal law, theFourteenth Amendment to the U.S. Constitution, in that the class of which the acquittee is a part is treated differently than convicted prisoners who are committed to a mental hospital during their sentence, two classes which our Supreme Court has stated in State v. Metz, 230 Conn. 400,424-25, 645 A.2d 965 (1994) are constitutionally equal, and that there is no rational basis to treat those two classes of individuals differently. The third and final claim the acquittee has made is that the statute violates the principles of equal protection under Art. I, § 20 of the Connecticut Constitution. The acquittee argues that under the state constitution the review of the state action which impinges on the suspect classification of mental illness is subject to strict scrutiny, and state action which fails under a rational basis review will also fail under a strict scrutiny review. CT Page 11253
The court agrees with the acquittee in each of his three claims.
This court has determined that the acquittee has met his substantial burden of proof beyond a reasonable doubt, relevant to the constitutionality of the statute in question and therefore this court holds that the statute, General Statute § 17a-593 (c), is unconstitutional. Acquittee's Motion to Dismiss the Petition for Commitment is granted. The acquittee's Motion to Strike the Report of the Psychiatric Security Review Board is denied. The acquittee is to be held for a period of 60 days from the date of the filing of the memorandum to allow the state, if it so elects, to pursue a petition for civil commitment before the probate court.
 II. FACTS
Calvin Long was originally charged by information with Assault in the Second Degree, in violation of General Statute § 53a-60, a class D Felony.[2] On or about August 18, 1986, after trial to the court, the acquittee was found not guilty by reason of mental disease or defect.
Under General Statute § 17a-582 (a), a person acquitted pursuant to General Statute § 53a-13 is automatically, upon a verdict, committed by the court to the custody of the commissioner of mental health for initial confinement and examination. After a psychiatric examination in a state hospital the court is required to hold a hearing in order to "make a finding as to the mental condition of the acquittee." General Statute § 17a-582 (e). On the basis of this hearing the court,[3] under General Statute § 17a-582 (d) and 17a-582 (e) made a finding that the acquittee is a person who should be confined and ordered the acquittee committed to the jurisdiction of the Board and the court fixed a maximum term of commitment, a period not to exceed five (5) years confinement, which is the maximum period to which the acquittee could be sentenced had he been convicted of the offense. General Statute § 17a-582 (e)(1) (A).
Prior to the expiration of the five year maximum term of the acquittee's commitment, the state's attorney petitioned the Superior Court to extend the acquittee's commitment for a further period of time beyond the five year maximum on the ground that the acquittee remained mentally ill to the extent his discharge at the expiration of his maximum term of commitment would constitute a danger to himself or others, pursuant to General Statutes § 17a-593 (c). The re-commitment of the acquittee has successively been extended according to the provisions of General Statutes § 17a-593 (c) multiple times. At this point in time the re-committee[4] has been held in the custody of the Board for a CT Page 11254 total of sixteen years. We are here on the state's most recent petition seeking to extend the re-committee's commitment. The re-committee has filed a Motion to Dismiss the Petition and a Motion to Strike the Report of the Psychiatric Security Review Board.
After the state filed its most recent petition, the re-committee was examined by an independent doctor, at his request, as provided for in General Statute § 17a-582 (c). The re-committee was examined by Dr. Peter Zeman who also prepared a report documenting his findings.
The court conducted a hearing pursuant to General Statute § 17a-582
(d), (e) and (f). Pursuant to Metz, supra, 425, the state must bear the burden of proving the need for a period of continued commitment of an acquittee after the expiration of the maximum term specified by General Statute § 17a-582 (e)(1)(A). Our Supreme Court further imposed upon the government in said proceeding the civil commitment standard of clear and convincing evidence that the subject individual is mentally ill and dangerous.
This court has reviewed and considered the entire court's file relevant to Mr. Long, the content and findings of the Board in its report to the court, the report of Dr. Peter Zeman dated September 25, 2001, and the testimony before this court on January 9, 2002, of state's witnesses Dr. Virginia Johnson and Robert Chase, and the re-committee's witness Dr. Zeman.[5]
The court finds that the re-committee suffers from a form of mental illness diagnosed as schizoaffective disorder,[6] is currently unstable (even with medication), has intermittent paranoia, significant mood swings, is easily provoked, frequently threatening, and threatens serious violence. Mr. Long has a history of non-compliance relevant to medication.
This court further finds that the re-committee does not appreciate the nature of his illness, his understanding of his need for medication is very limited and in the event the re-committee does not take his medication he would "very quickly relapse and become irritable" resulting in an increase in threatening behavior.
This court finds that the state has met the burden set out in Metz, proving by clear and convincing evidence that the re-committee has a mental illness and would be a danger to others were he discharged from confinement.
 III. REVIEW AND COMPARISON OF RELEVANT STATUTES
CT Page 11255
The analysis of the re-committee's claims require this court to first review the pertinent statutes related to involuntary commitments.
The statutes applicable to individuals with psychiatric disabilities warranting involuntary commitment are, for our purposes, divided into two categories:
A) Those statutes applicable to the commitment of the individual in the criminal court context wherein the defendant is found not guilty by reason of mental disease or defect (General Statute §§ 17a-580 through17a-603); and B) Those statutes applicable to the commitment of the individual in the civil context (General Statute §§ 17a-497 through17a-520).
Our inquiry must focus on these statutes and whether the involuntary committees in each category are treated in accordance with the due process and equal protection provisions of our state and federal constitutions.
A. Individuals in the criminal context found not guilty of a crime dueto mental disease or defect. We will first focus on those individuals who were under the jurisdiction of the Superior Court due to the pendency of a criminal matter. In any criminal matter, Connecticut law allows a defendant to pursue the affirmative defense of a lack of mental capacity to commit the crime due to a mental disease or defect.[7]
In the event the trier of fact finds that the defendant has proven this defense, the fact finder would then report a verdict of "not guilty by reason of mental disease or defect." When a defendant is found to be not guilty of the crime charged by reason of mental disease or defect, the acquittee may be committed by the Superior Court to the jurisdiction of the Board for a ". . . maximum term of commitment, not to exceed the maximum sentence that could have been imposed if the acquittee had been convicted of the offense. . .". (General Statute § 17a-582 (e)(1) (A)). It is as a result of this procedure that the re-committee, Calvin Long, was originally relegated to the jurisdiction of the Board. The initial commitment of Mr. Long is not contested.
Provision is made in the statutes for an extension of the period of commitment of the acquittee beyond the maximum term of imprisonment that could have been imposed if the acquittee were convicted: "If reasonable cause exists to believe that the acquittee remains a person with psychiatric disabilities . . . to the extent that his discharge at the expiration of his maximum term of commitment would constitute a danger to himself or others, the state's attorney . . . may petition the court for CT Page 11256 an order of continued commitment of the acquittee." General Statute § 17a-593 (c). This is the statutory clause which the re-committee claims violates his constitutional rights of due process and equal protection.
The procedures accorded the acquittee concerning the release or continued commitment are the following: During the acquittee's commitment the Board may re-commend to the court the discharge of the acquittee from custody or the acquittee may apply directly to the court for discharge from custody. General Statute § 17a-593 (a). When the commitment of the acquittee is going to expire, the state's attorney is authorized to petition for an extension of the commitment. In the event the acquittee applies for discharge or the state's attorney petitions for continued confinement the court shall forward any application for discharge received from the acquittee and any petition for continued commitment of the acquittee to the Board. Regardless of whether it is the Board, the acquittee or the state asking the court to review the continued commitment of the acquittee, the Board shall file a report with the court setting forth its findings and conclusions as to whether the acquittee is a person that should be discharged. General Statute § 17a-593 (d).
The State's attorney has the right to conduct a separate examination of the acquittee, General Statute § 17a-593 (e). The acquittee has the right, even if indigent, to a separate examination performed by a psychiatrist or psychologist of the acquittee's own choice. General Statute § 17a-593 (e).
After receipt of the report of the Board and any separate examination reports, the court shall commence a hearing on the re-commendation or application for discharge or petition for continued commitment. General Statute § 17a-593 (f). The statutes appear on their face to require the acquittee to establish by a preponderance of the evidence that he is a person who should be discharged. In State v. Metz, supra, the Connecticut Supreme Court reviewed the issue of the proper allocation of the burden of proof to determine the continued commitment to a mental hospital of a person previously found not guilty of criminal charges by reason of mental disease or defect. Id. 402
While the statute makes no distinction on its face as to how an acquittee is to be treated relevant to any commitment beyond the maximum term of confinement, Metz articulates a "point of demarcation" and holds that when the state petitions for a period of additional commitment beyond the maximum term articulated in General Statute § 17a-582 (e) (1)(A) the state must prove by clear and convincing evidence that the acquittee is currently mentally ill and dangerous to himself and others. CT Page 11257Id. 425.
Under the statutory scheme which establishes the Board, there is a requirement that the Board assess and report on all acquittees committed to the Board at least every six months. General Statute § 17a-586. The relevant statutes also provide that the Board shall conduct a hearing at least every two years in order to review the status of the acquittee. General Statute § 17a-585. The procedures to be followed by the Board when conducting the hearings are provided for by statute and resemble court proceedings in most material respects.
In the event the acquittee was to abscond from his place of confinement, that unexcused leaving would be treated as the commission of the crime of Escape in the First Degree, a class C felony, in violation of General Statute § 53a-169 (a)(6).
B. Individuals committed civilly. We must now contrast the civil commitment statutes (General Statute §§ 17a-497 through 17a-520). The involuntary committee under the civil commitment statutes is under the jurisdiction of the Probate Court.
In the event of an application for civil commitment the individual has a right to a hearing before the Probate Court, which is conducted before a probate judge or three probate judges at the election of the person sought to be committed. The Probate Court is directed to follow the rules of evidence. The Probate Court shall require the certificates of at least two impartial physicians selected by the court. General Statute §17a-498 (c).
The individual sought to be committed shall have a right: To counsel, even if indigent; to present evidence; to cross-examine witnesses; to cross-examine examining physicians; Id.
If such Probate Court, upon hearing, finds by clear and convincing evidence that the person complained of has psychiatric disabilities and is dangerous to himself or others, it shall make an order for his or her commitment. Appeals of the decision of the Probate Court are taken as ade novo trial to the Superior Court. Once an individual is committed, theProbate Court is required to conduct periodic judicial reviews of thecommitment. The Probate Court is required to conduct a court hearing every two years in order to redetermine whether the committee is an individual who should continue to be committed. General Statute §17a-498 (g).
Should the civilly committed person abscond from their place of CT Page 11258 confinement, they shall be re-committed, with the help of the state or local police department, if appropriate. General Statute § 17a-522. The unauthorized leaving of the facility is not a criminal act.
It is noteworthy that when the state wants to extend the commitment of an acquittee, who is under the jurisdiction of the Board, beyond the maximum period of commitment, the state is directed to the statutory scheme under the authority of the Board. However, when the state wants to petition for the commitment of an individual who has been convicted (as contrasted to an acquittal due to mental disease or defect) of a crime, who is serving his or her sentence under the jurisdiction of the commissioner of corrections, General Statute § 17a-515 directs the state to follow the statutory scheme applicable to civil commitment, under the jurisdiction of the Probate Court.
 IV. REPORT OF THE BOARD
The re-committee moves this court to strike the report of the Board and requests that the contents of the report not be considered as evidence in the re-commitment hearing before the Superior Court.
Pursuant to General Statute § 17a-593 (d), upon receipt of any application for discharge received from the acquittee and any petition for continued commitment of the acquittee the Board "shall . . . file a report with the Court . . . setting forth its findings and conclusions as to whether the acquittee is a person who should be discharged." The report shall be forwarded to the Superior Court.
First, the re-committee claims that an overview of the statutory scheme relevant to the Board reveals that there is a procedural and substantive bias against the acquittee due to the legislative mandate that in making its findings as to the mental condition of the acquittee the Board is to consider "that its primary concern is the protection of society," pursuant to § 17a-584. The re-committee claims that this is a statutorily mandated bias which places the "protection of society" above an acquittee's liberty interest. The re-committee emphasizes that there is no indication that an acquittee's liberty interest even factors into the Board's re-commendation.
Secondly, the re-committee claims the Board's re-commendation is "irrelevant, immaterial and its prejudicial impact outweighs its probative value." The re-committee bases this conclusion on the assumption that the procedures relevant to the civil committee under the jurisdiction of the Probate Court are advantageous to the civil committee as compared to the procedures applicable to the re-committee under the jurisdiction of the CT Page 11259 Board.[8]
Because the strict rules of evidence are not adhered to in the hearing before the Board, claims the re-committee, and the admissibility of the evidence is therefore very broad, accordingly, the re-committee opines, the Board's re-commendation is generally based on some irrelevant, immaterial and prejudicial evidence. The re-committee claims that to protect the re-committee's right to a fair trial, the re-commitment hearing in the Superior Court should parallel an appeal from the Probate court, which affords an individual the judicial safeguards inherent in a de novo court proceeding without the taint of the Board's re-commendation.
The re-committee claims that the Board's over reliance on historical information renders its report to the court irrelevant, immaterial and prejudicial to the evaluation of the then existing condition of the acquittee.
In the civil context the review of the Probate Court's commitment order is a de novo trial in the Superior Court. The relevant inquiry as to the mental condition of the person committed and the assessment of their dangerousness must be relevant to the current existing condition of the committee. If the Superior Court were "limited to an evaluation of the [person's] condition as it existed at the time of the [board] hearing the evidence and testimony must all revert back to his past condition and the court will, of necessity, be deprived of a most critical factor in a commitment determination, that of actually viewing the [person's] behavior and demeanor at the time of the hearing." Thomas v. Arafeh,174 Conn. 464, 469, 391 A.2d 133 (1978).
The re-committee's claim is that a report prepared in the past, and the Board's use of historical information, robs the Superior Court of its ability to assess the re-committee's current mental condition and dangerousness.
Also the re-committee claims reliance on the Board's report would offend the re-committee's right to a fair trial, the right to cross-examine witnesses, and the right to produce evidence in that §17a-593 does not explicitly require the Board to hold a hearing before forwarding its re-commendation to the court, therefore re-committee's right to cross-examine witnesses and to contest or present evidence may be compromised. In the civil context, asserts the re-committee, the committee has the right to cross examine witnesses and to present evidence pursuant to § 17a-510. CT Page 11260
The court finds the claims of the re-committee in support of its motion to strike the Board's report from consideration by this Court not persuasive.
First, the argument of the re-committee relevant to the so-called "protection of society" consideration of the Board has no merit. General Statute § 17a-584 reads in relevant part: "At any hearing before the board . . ., except a hearing pursuant to . . . subsection (d) ofsection 17a-593, the Board shall make a finding as to the mental condition of the acquittee and considering that its primary concern is protection of society, shall do one of the following. . . ." (Emphasis added).
A literal reading of General Statute § 17a-584 exempts the "protection of society" considerations articulated in § 17a-584 from the Board's mandate under § 17a-593 (d). It is § 17a-593 (d) that provides for the Board to prepare a report for the benefit of the Court and the Board is to set forth "its findings and conclusions as to whether the acquittee is a person who should be discharged."
Assuming, arguendo, that the mandate of the Board, is as the re-committee claims, there is nothing in the record from which the court could reasonably infer that the impartiality of the Board was in any way compromised or its findings in any way affected by any such "protection of society" considerations.
The fact that a Board hearing is discretionary with the Board is of no moment in the instant matter as the re-committee was given a hearing by the Board.
Despite the claim of the re-committee, in the hearing before the Board the focus is on the current condition of the acquittee. Any reference to historical data, including observations by staff over a continuum, is most certainly relevant in assisting the Board in its re-commendation and, subsequently, the court in its findings relevant to the current condition of the re-committee.
A hearing was held before the Board.
At the hearing before the court the re-committee had the right to be present, the right to be represented by counsel, the right to cross-examine witnesses and the right to call witnesses on his own behalf. The re-committee did utilize each of these rights.
A review of General Statute § 17a-581 relevant to the Board demonstrates that the legislature made significant efforts in order to CT Page 11261 insure the objectivity and fairness of the Board and intended that the Board not serve as a rubber stamp for the interests of the state or the hospital treating the re-committee
The law provides that the Board shall be an "autonomous body within the Department of Mental Health and Addiction Services for administrative purposes only." The legislature carefully designated the individuals that are to comprise the six member Board in order to confirm the Board's intended objectivity.[9]
It is noteworthy that the report of the Board to the Court is merely a re-commendation and can be rejected by the Superior Court in the event that the Court questions its objectivity or for any other valid reason (s) finds the report of the Board not worthy of consideration.
The re-committee has not carried his burden of proof. Accordingly, the re-committee's Motion to Strike the Report of the Board is denied.
 V. DISCUSSION
A. STATUTORY INTERPRETATION
The analysis of the re-committee's claims requires this court to ascertain the meaning of the statute in question.
Heretofore, the trial courts have been advised that a statutory rule of construction provides in the event the language of the statute is clear and unambiguous the courts should go no further in their investigation in determining the meaning of the language other than the plain language provided in the statute.
However, whether the language is plain and unambiguous, or otherwise, our inquiry should go further.[10] See Historical Underpinnings, infra, pages 64-68.
The legislative history concerning Public Act 85-506, the act which created the Board, and the procedures which it would follow, was reviewed. This court is unable to discern any meaningful intent from the limited comments made when this act was adopted. However, the language of the statute is clear and unambiguous. Where the language of a statute is clear and unambiguous, this court is "constrained to read a statute as written and . . . may not read into clearly expressed legislation provisions which do not find expression in its words." (Internal quotations marks omitted, internal citations omitted) Giaimo v. NewHaven, 257 Conn. 481, 494, 778 A.2d 33 (2001). CT Page 11262
B. RE-COMMITTEE'S STANDARD OF PROOF
It is axiomatic that "[c]onstitutional issues are not considered unless absolutely necessary to the decision of a case . . . or unless sufficient public interest warrants such a review." (Citation omitted). Chothowskiv. State, 213 Conn. 13, 16-17, 566 A.2d 419 (1989). In this review, the court is mindful that "legislative enactments carry with them a strong presumption of constitutionality, and that a party challenging the constitutionality of a validly enacted statute bears the heavy burden of proving the statute unconstitutional beyond a reasonable doubt." Becciav. Waterbury, 192 Conn. 127, 133, 470 A.2d 1202 (1984); see also State v.Ball, 260 Conn. 275, 280, 796 A.2d 542 (2002). "Proper respect for a co-ordinate branch of government requires that every presumption must be made in favor of validity and that an act must be sustained unless its invalidity is established beyond a reasonable doubt." Maisonette v.Hartford Housing Authority, Superior Court, Judicial District of Hartford-New Britain, Docket No. 545863 (December 4, 1996, Lavine, J.). The Superior Court "should be exceedingly reluctant to override the legislature's conclusion and should uphold an act if it can be supported on any reasonable ground, either express or apparent." (Citations omitted). Id. A party mounting a constitutional challenge to the validity of a statute must provide an adequate factual record in order to meet its burden of demonstrating the statutes adverse impact on some protected interest of its own, in its own particular case, and not merely under some hypothetical set of facts yet unproven. " Payne v. Fairfield HillsHospital, 215 Conn. 675, 684, 578 A.2d 1025 (1990).
C. DUE PROCESS ANALYSIS
1. Mathews v. Eldridge Standard.
Due process analysis requires balancing the government's interest in existing procedures against the risk of erroneous deprivation of a private interest inherent in the procedures. (citations omitted). Statev. Patterson, 236 Conn. 561, 571, 674 A.2d 416 (1996). All that is necessary is that the procedures be tailored, in light of the decision to be made, to the capacities and circumstances of those who are to be heard . . . to insure that they are given a meaningful opportunity to present their case. id., quoting Matthews v. Eldridge [424 U.S. 319, 348-49,96 S.Ct. 893, 47 L.Ed.2d 18 (1976)]. Under this analysis, the court must consider three factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the CT Page 11263 government's interest, including the function involved and the fiscal and administrative burdens that additional or substitute procedural requirements would entail. (Citations omitted). State v. Patterson, supra, 572.
 a. The Interest Affected
Due process analysis begins with identification of the interests at stake. The re-committee claims that the statute, General Statute §17a-593 (c), which allows the state to extend his commitment beyond the maximum term authorized by General Statute § 17a-582 (e)(1)(A) violates his due process right to liberty arising under the Connecticut Constitution, Article I Section 8.[11]
Article 1, Section 8 of the Connecticut Constitution reads in relevant part: "In all criminal . . . prosecutions (n)o person shall . . . be deprived of life, liberty or property without due process of law. . .".[12]
The involuntary committee, whether an individual committed pursuant to the civil criteria under the jurisdiction of the Probate Court or an acquittee/re-committee under the jurisdiction of the Board does have a liberty interest in the proceedings and the results of the proceedings.
Mr. Chief Justice Burger spoke of the process due a person civilly committed to a mental institution: "There can be no doubt that involuntary commitment to a mental hospital, like involuntary confinement of an individual for any reason, is a deprivation of liberty which the State cannot accomplish without the due process of law." Fasulo v.Arafeh, supra 476, citing Specht v. Patterson, 386 U.S. 605, 608,87 S.Ct. 1209, 18 L.Ed.2d 326 (1967). Freedom from unjustified government intrusions into personal security and bodily freedom are basic, historically recognized liberty interests that are protected by the federal constitution. State v. Metz, supra, 412, citing Foucha v.Louisiana, 504 U.S. 71, 80, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992). As a matter of federal law, "[i]t is clear that commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection; " Foucha v. Louisiana, supra, 80; that is, "the nature of commitment [must] be justified on the basis of a legitimate state interest, and the reasons for committing a particular individual must be established in an appropriate proceeding. Equally important, confinement must cease when those reasons for confinement no longer exist. Fasulo v.Arafeh, supra.
The problem with the current procedures is that they fail to adequately CT Page 11264 protect the right of the re-committee to be released when the reasons for confinement no longer exist — a direct analogy to Fasulo (See infra pp. 28-29).
The court finds that the re-committee possesses a liberty interest in freedom from confinement at the hands of the state that is implicated during the re-commitment process. Therefore, the re-commitment process must satisfy the requirements of the due process clause. The re-committee has a legitimate interest in the character of the procedure which leads to his re-commitment.
The liberty interest the re-committee has in this case is real and substantial.
 b. Risk of an Erroneous Deprivation
In furtherance of our due process analysis we must next consider the risk of an erroneous deprivation of the re-committee's liberty interest through the re-commitment procedures used, and the probable value, if any, of additional or substitute procedural safeguards.
Inquiry into whether particular procedures are constitutionally mandated in a given instance requires adherence to the principle that due process is flexible and calls for such procedural protections as the particular situation demands. State v. Kelly, 256 Conn. 23, 78,770 A.2d 908 (2001), citing Morrissey v. Brewer, 408 U.S. 471, 481,92 S.Ct. 2593,33 L.Ed.2d 484 (1972). . . . Due process . . . is not a technical conception with a fixed content unrelated to time, place and circumstances. Id., (citations omitted).
Due process requires notice and an opportunity to be heard "at a meaningful time and in a meaningful manner;" (citations omitted), FermontDivision v. Smith, 178 Conn. 393, 397, 423 A.2d 80 (1979); but does not mandate any specific form of procedure; rather it protects substantive rights. Id. (Emphasis in original).
It is true that "[i]n almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses. (Internal quotation marks omitted). (Citations omitted). State v. Kelly, supra, 79. Due process requires that the nature of commitment bear some reasonable relation to the purpose for which the individual is committed. Foucha v. Louisiana, supra, 72.
The concept of due process, when the government seeks to deprive a CT Page 11265 person of life, liberty or property, is that the thoroughness of the procedure by which the deprivation is effected must be balanced against the gravity of the potential loss and the interests at stake, and due process requires that the procedure involved must be appropriate to the nature of the case. (Citations omitted). Shea v. State Employee'sRetirement Commission, 170 Conn. 610, 616, 368 A.2d 159 (1976).
When a judge initially commits an acquittee, the maximum period of commitment that the judge can impose is the maximum sentence which the acquittee was exposed to in the event of conviction of the particular offense. General Statute § 17a-582 (e)(1)(A). As the end of that commitment period approaches, the state can petition the court to extend the period of commitment beyond the maximum term for the offense. General Statute § 17a-593 (c). Should the state prove to the court by clear and convincing evidence that the acquittee has a mental illness and is dangerous to himself or others, the court can extend the commitment of the acquittee beyond the maximum period provided for the offense. General Statute § 17a-593 (c); State v. Metz, supra, 424.
The re-committee's claim is that a statutory scheme which provides for the extension of commitment beyond the maximum term, without also providing for regular or periodic judicial review of that commitment, or at least a maximum period of commitment, wherein the court must determine the appropriateness of further commitment, violates the principles of due process under the Connecticut Constitution Article 1, Section 8.
Although there is a requirement that the Board review and report on the status of the re-committee regularly, and also that the Board hold a hearing on the necessity of the ongoing commitment of the re-committee, the only time a re-committee may be accorded judicial review of his or her commitment is 1) when the re-committee himself or herself asks for it, and 2) the Board re-commends that the re-committee be discharged. General Statutes § 17a-593 (a).[13]
We will review first the statutory right of the re-committee to challenge, or seek review of, their re-commitment status. There are, in all likelihood, certain limitations incumbent upon any individual involuntarily committed wherein he or she has been found to be suffering from a mental disease or defect.
 "Any procedure to allow the release of involuntarily confined civilly committed individuals must take account of the controlled and often isolated environment of the mental hospital from which the confined individuals will seek release. It must CT Page 11266 calculate the possible incompetence of those confined, their limited knowledge of release procedures, the cost of pursuing review and the amount of effort necessary to pursue review. Further, the procedure must be adapted to the possible effect of drugs or other treatment on the patient's capacity. . .". Fasulo v. Arafeh, supra, 473, 478.[14]
Clearly then, to have one's substantive due process right to liberty depend for its very existence upon the re-committee's formal assertion of that right is not only problematic but does not accord the re-committee any regular access or entitlement to judicial review and certainly not regular periodic judicial review of his or her commitment status.
The second route available to the re-committee to challenge his or her commitment status at a judicial proceeding occurs in the event that the Board recommends that the re-committee be discharged from commitment.[15]
of course, it is possible that the Board at no time will recommend the discharge of the re-committee and in that event no judicial review of the re-committee's commitment will ever take place under this alternative route for judicial review.
We must also bear in mind when analyzing this second route to judicial review that there may be "institutional pressures[16] (upon the Board) to rely on the medical judgments of the hospital staff rather than to pursue extra-institutional legal remedies." (Citation omitted). (Emphasis added). Fasulo v. Arafeh, supra, 478.
This second route disregards the fundamental fact that the state's power legitimately to confine an individual is based on a legal determination (under General Statute § 17a-582 (e)(1)) "that the person complained of is mentally ill and dangerous to himself or others . . ." and that the commitment shall only continue "for the period of the duration of such mental illness or until he or she is discharged in due course of law." Fasulo v. Arafeh, supra, 479.
A careful review of the statutory scheme concerning re-committees as it currently exists does not reveal any statutory guidance for a court as to the minimum or maximum period of re-commitment. The statutory scheme does reveal that at the time of the expiration of the maximum term of commitment General Statute § 17a-593 (c) allows a judge to re-commit the re-committee for an indefinite, unlimited period of time. Also absent from the statutory scheme is any right of the re-committee to on-going or periodic judicial review of the re-committee's status. CT Page 11267
The re-committee herein claims the re-commitment could be for an indefinite duration and the failure of the statutory scheme to provide him with periodic judicial review of his re-commitment status violates his substantive due process rights under Article I, Section 8 of the Connecticut Constitution.
The issue of whether an involuntary committee is entitled to periodic judicial review of his or her commitment status under the due process clause (Art. I, Section 8) of our state constitution was reviewed inFasulo v. Arafeh, supra 475. In Fasulo, Ms. Ann Fasulo and Ms. Marie Barbieri were each civilly committed to Connecticut Valley Hospital, a state operated facility for mentally disordered adults, for a period of 26 years and 13 years, respectively. Both individuals claimed, inter alia, that because their commitments were of "indefinite duration and there is no procedure for periodic court review of the necessity for their confinement, their confinement is in violation of the due process guarantee of Article first, § 8 of the Connecticut Constitution."Id. 475. Under the applicable statute for civil commitments at the time, the necessity for confinement was to be determined according to a legal standard as a conclusion of law. Id.
The committee had a right to a judicial hearing initiated by the state at which the state bore the burden of proving that involuntarily commitment is necessary. Id.
As the United States Supreme Court has recognized, "[a]t the least, due process requires that the nature and duration of the commitment bear some reasonable relation to the purpose for which an individual is committed." (Citation omitted). Id. Once the purpose of commitment no longer exists, there in no constitutional basis for the state to continue to deprive the individual of his liberty. Id., 476-77.
"The state's power to confine terminates when the patient's condition no longer meets the legal standard for commitment. Since the state's power to confine is measured by a legal standard, the expiration of the state's power can only be determined in a judicial proceeding which tests the patient's present mental status against the legal standard for confinement. That adjudication cannot be made by medical personnel unguided by the procedural safeguards which cushion the individual from an overzealous exercise of state power when the individual is first threatened with the deprivation of his liberty." (Emphasis added). j.Z., 479.
Our Supreme Court held in Fasulo that commitment of an individual to a mental hospital must end when the legitimate state interest in confining CT Page 11268 the person no longer exists and that the due process clause of our state constitution demands that civil commitment requires ongoing periodic judicial review, that the ongoing deprivation of liberty was no less onerous a burden on the fundamental right to liberty than the burden of the initial confinement was. Id., 479. The failure to provide periodic judicial review in Fasulo resulted in the statute in question, the civil commitment statute, General Statute § 17-192 (Rev, to 1977), being found unconstitutional.
Relevant to the case at bar. The Board's statutory scheme, applicable to Calvin Long, does provide all acquittees with ongoing periodic review by the Board. Under General Statute § 17a-586 all acquittees are assessed, and a report is prepared concerning the appropriateness of the commitment every six months. The Board is also statutorily obligated to conduct a hearing on the appropriateness of the commitment every two years. General Statute § 17a-585.
Review of the re-committee's commitment status by the Board is not "periodic judicial review" and is no substitute for periodic judicial review. It is not periodic[17] in that judicial review may never occur after the initial commitment, the acquittee may not request review and/or the Board may not recommend that the acquittee be discharged.
Nor is a review by the Board a "judicial" review of the status of the confinement. "Judicial" connotes a court of proper jurisdiction that is capable of utilizing a legal standard which tests the patient's present mental status against the legal standard of confinement. As was enunciated in Metz, "in the case of acquittees the Superior Court has the authority to decided the propriety of such a confinement" in a judicial proceeding. State v. Metz, supra, 406.
The substitution of the Board for a court of competent jurisdiction does not provide the re-committee with "judicial" review of his continuing confinement. The Board is an administrative body created by statute. General Statutes §§ 4-185, 17a-581. It is not a court. Furthermore, the actions of the Board do not rise to the level of a "quasi-judicial" review regarding the continued confinement or discharge of a committee acquittee. Whether the Board is "quasi-judicial" or not does not depend on its title, but instead on the functions of the Board. Our courts have outlined "a number of factors that assist in determining whether a proceeding is quasi-judicial in nature. Among them are whether the body has the power to: (1) exercise judgment and discretion; (2) hear and determine or to ascertain facts and decide; (3) make binding orders and judgments; (4) affect the personal or property rights of private persons; (5) examine witnesses and hear the litigation of the issues at a CT Page 11269 hearing; and (6) enforce decisions or impose penalties." (Internal quotation marks omitted, internal citations omitted) Kelley v. Bonney,221 Conn. 549, 567, 606 A.2d 693 (1992). In the context of the discharge or continued confinement of the re-committee, the Board lacks the power to do many of these things. In this context, the Board is unable to make binding orders, it can only recommend the discharge or continued confinement of the committee to the superior court. General Statute § 17a-584. Because it cannot make an order, the result of the Board hearing on discharge or re-commitment does not affect the rights of the re-committee. Finally, the Board is unable to enforce its decision, or impose penalties regarding its re-commendation in the context of a discharge or re-commitment. General Statute § 17a-584. Since the Board is not a judicial or quasi-judicial body, its ability to periodically monitor the ongoing commitment of a re-committee does not adequately protect the re-committee's due process right, under the Connecticut constitution, to periodic judicial review. The Board is required to conduct a hearing every two years on the appropriateness of the confinement of all committees. General Statute § 17a-585. However, this ongoing periodic review is insufficient to protect the re-committee's rights to have the legal standard of his continued confinement tested in a judicial proceeding.
Because of this lack of direction, the absence of any limitation on the power of the court to continue the confinement of the re-committee, and the failure of the statute to provide for periodic judicial review of the re-committee status, the statute, General Statute § 17a-593 (c), is problematic. The statute provides no guidance or limitation for the trial court relevant to the duration of the period of time for which the re-committee can be re-committed. Compare this to the limitation imposed on the judge at the initial commitment proceeding wherein the trial court is limited in his or her imposition of a period of commitment to a period of time equal to the maximum period of incarceration in the event the acquittee had been convicted of the underlying offense. In the case at bar, the re-committee, Mr. Calvin Long, has been under the jurisdiction and custody of the Board for a period of sixteen years, after being found not guilty by reason of mental disease or defect of a crime with a maximum penalty of five years. "[T]hus requiring us to heed the warning of the United States Supreme Court that the longer the commitment, the greater the safeguards which are required to ensure that no one is deprived of liberty without due process." (Internal citations omitted). (Internal quotation marks omitted). Fasulo v. Arafeh, supra, 477.
The acquittee is entitled to, and accorded, periodic review of his status by the Board. It is noteworthy that the state's power to confine is measured by a legal standard. In any periodic assessment by the CT Page 11270 Board, the Board cannot engage in a process wherein the Board tests the patient's present mental status against the legal standard for confinement. This is a process that can only be provided in a judicial proceeding. The fact that the Board cannot perform such a function makes it obvious that the legal standard for confinement cannot be addressed by the Board. Therefore, an assessment of the status of a re-committee to determine whether continued confinement is necessary cannot properly be made by the Board.
Without a proper analysis, the appropriateness of his commitment status cannot be determined. Therefore, there is a real and substantial risk that a re-committee, with Board review only, may continue to be confined without any assessment of the legal standard for confinement and could result in a re-committee's continued confinement when de facto such continued confinement is inappropriate.
A re-committee can be held only so long as he or she is determined to be mentally ill and dangerous. It is a legal conclusion. The Board cannot render such a legal determination.
As was stated earlier, the state's power to confine terminates when the patient's condition no longer meets the legal standard for commitment. Since the state's power to confine is measured by a legal standard, the expiration of the state's power can only be determined in a judicial proceeding which tests the patient's present mental status against the legal standard for confinement. A proceeding before the Board is not a judicial proceeding.
The lack of any periodic judicial review of the re-committee's status increases the risk that the re-committee could continue to be confined during a period when he is no longer mentally ill or no longer a threat to himself or to others. These are legal standards that can only be determined in a legal or judicial proceeding that must occur at regular intervals in order that a review of his status will be properly conducted at timely intervals.
The fact that a proper assessment of the re-committee's confinement status cannot be made by the Board combined with the fact that the re-committee is not entitled to periodic judicial review of his status makes very real and substantial a risk of an erroneous and substantial deprivation of his liberty interest.
 c. Government Interest
The third and final inquiry by the court relevant to the due process CT Page 11271 claim is for this court to consider "the government's interest, including the function involved and the fiscal and administrative burdens that additional or substitute procedural requirements would entail." State v.Patterson, supra, 572.
The State of Connecticut certainly has an interest in confining individuals who are mentally ill and a danger to themselves or others. This interest is not challenged. At this juncture the issue is not the release of the individual into society, because this court did find that the re-committee is mentally ill and a danger to others. The issue is in the event that the re-committee were treated pursuant to the civil commitment statutes would that impose a substantial burden on the state.
The state has not specified any particular hardships or costs involved in the event that the re-committee was accorded the rights and protections enjoyed by those civilly committed. Some administrative changes will have to be implemented but the re-committee, if civilly committed, will still be confined. Any cost increases or change of administrative efforts are negligible. This third criteria for analysis of the due process claim this court must consider to be neutral.
2. Historical Underpinnings
Although the language of General Statutes § 17a-593 (c) is on its face clear and unambiguous, that does not preclude this court from a review of the statutes genealogy in order to assist this court in its interpretation of the statutory language.
It is appropriate in the context of reviewing the constitutionality of General Statutes § 17a-593 (c) to review the prior relevant statutes concerning the confinement of persons acquitted by reason of mental disease or defect, prior to the legislative creation of the Board. General Statute (Rev, to 1983) § 53a-47 provided for persons found "guilty but not criminally responsible on the grounds of mental disease or defect" to be temporarily confined in a "state hospital for mental illness" pending examination and hearing. General Statute (Rev. To 1983) § 53a-47 (a)(1). Should the court find that the state has proven by a preponderance of the evidence that the "person is mentally ill to the extent that his release could constitute a danger to himself or others, the court shall confine such person in a suitable hospital or other treatment facility . . ." until "he is no longer a danger to himself or others" or the maximum term of confinement set by the court, which "shall not exceed the maximum sentence which could have been imposed if the person had been convicted of the offense." General Statute (Rev, to 1983) § 53a-47 (a)(2); § 53a-47 (b). At the expiration of the maximum CT Page 11272 period of confinement, the state's attorney may petition the court for an order of further confinement. General Statute (Rev. To 1983) 53a-47 (d). The court would then conduct a hearing wherein the state would have the burden of proving that "such person's continued confinement is warranted because he is mentally ill to the extent that his release would constitute a danger to life or person." General Statute (Rev, to 1983)53a-47 (d). If the court after a prompt hearing continues the confinement, the person so confined shall have the right to have thesuperior court review the appropriateness of the confinement at a minimumof every five years. General Statute (Rev, to 1983) § 53a-47 (d). (Emphasis added).
Compare this with the present statutes, sections 17a-581 through 17a-602, inclusive, which, although the same in many material respects, have now substituted periodic review of the confinement by a court with periodic review by an administrative body, the Board. General Statute § 17a-585. Under current law, the confinement of all committees is reviewed by the Board every two years. General Statute § 17a-585. An additional item of merit concerning the 1983 revision of § 57a-47 and the current statutes is the fact that the 1983 revision of subsection (d) of §53a-47 requires the state to prove the continued dangerousness of the committee before the committee's confinement can be extended, the same requirement found in a "latent ambiguity" in the current statute, §17a-593 (f) by the Connecticut Supreme Court in State v. Metz, supra.
There are some surprising parallels between the re-committee's situation herein, and the situation of the plaintiffs in Fasulo v.Arafeh. In Fasulo, the plaintiffs were seeking equality between the civil committees and the criminal acquittees. Fasulo argued that it offended due process that civil committees were not afforded periodic judicial review, just like the criminal acquittees. At the time, the statute in question, § 53a-47, which covered the procedures concerning criminal acquittees, required the superior court to conduct periodic (every five years) hearings concerning the propriety of the continued commitment of the acquittee. General Statute (Rev, to 1983) § 53a-47. If the state failed to prove, by a preponderance of the evidence that the acquittee was still mentally ill and a danger to himself or others, the acquittee would have to be released. The Connecticut Supreme Court agreed withFasulo, and found the failure to provide civil committees periodic judicial review to be a violation of the committee's due process rights. Fast forward twenty-five years later, Mr. Long, the re-committee in this case, is now arguing that it offends due process that criminally committed acquittees are not afforded periodic judicial review, just likecivil committees. The due process claim of the re-committee is as strong now as the claim of Ms. Fasulo was twenty-five years ago. Under notions CT Page 11273 of fairness and equality, the re-committee is entitled to the same protections as those persons found not guilty by reason of mental disease or defect not so long ago.
It is noteworthy that the predecessor act provided the acquittee/re-committee with periodic judicial review of his or her commitment status. The re-committee's claim herein for periodic judicial review appears less outlandish and more reasonable when one considers that the right to judicial review had been provided by our legislature to previous acquittee's and re-committees.
In analyzing the due process claim, this court makes the following findings: 1) the re-committee has a liberty interest that is substantially affected by the legislation; 2) the risk of an erroneous deprivation of the re-committee's liberty interest in accordance with the present statutory scheme is both real and substantial and the probable value of substitute procedural safeguards is likewise real and substantial; and 3) the fiscal or administrative burdens of according re-committees rights commensurate with individuals civilly committed is negligible.[18]
Based on this due process analysis the court finds that the government's interest in existing procedures is outweighed by the re-committee's risk of an erroneous deprivation of this liberty interest. Accordingly, this court finds that the subject statute, General Statute § 17a-593 (c), which allows a court to extend the commitment of an re-committee beyond the maximum period set out in General Statute § 17a-582 (e)(1)(A) with no provision for periodic judicial review of the commitment is a violation of the re-committee's due process rights under Art I, Section 8 of the Constitution of Connecticut.
C. EQUAL PROTECTION ANALYSIS
The re-committee next claims that the subject statute, General Statute § 17a-593 (c), is unconstitutional on equal protection grounds under both the state and federal constitutions.[19]
This court will discuss the state and federal clauses simultaneously as "[t]he equal protection provisions of the federal and state constitutions have the same meaning and limitations." (Citations omitted). Franklin v.Berger, 211 Conn. 591, 594, 560 A.2d 444 (1989). However, the application of the re-committee's claims will be considered separately based upon the distinctions between the federal and state constitutions.
This court notes that "the concept of equal protection [under both the CT Page 11274 state and federal constitutions] has been traditionally viewed as requiring the uniform treatment of persons standing in the same relation to the governmental action questioned or challenged." (Citations omitted). Id. The starting point of the analysis of the substance of the re-committee's claim is the text of the equal protection clause of thefourteenth amendment to the United States Constitution which provides that no state shall "deny to any person within its jurisdiction the equal protection of the law." Similar protection is afforded persons in this state by article first, section 20 (as amended by amendment twenty-one) of the Connecticut Constitution which provides: "No person shall be denied the equal protection of the law nor be subjected to segregation or discrimination in the exercise or enjoyment of his civil or political rights because of religion, race, color, ancestry or national origin, sex or physical or mental disability." As our courts have recognized, "[e]qual protection of the law is a constitutional shield . . . which prohibits unequal treatment by the law of those who are similarly situated. The equal protection clause does not reject the government's ability to classify or `draw lines' in the creation and application of laws. Rather, it guarantees that those classifications will not be based on impermissible criteria." (Internal citations omitted). Franklin v.Berger, 15 Conn. App. 74, 544 A.2d 650 (1988). Rev, on other grounds211 Conn. 591, 560 A.2d 444 (1989).
To determine whether a particular classification violates the guarantees of equal protection, we must consider the character of the classification, the individual interest affected by the classifications, and the governmental interests asserted in support of the classifications. (Internal citation omitted). Where the classification impinges upon a fundamental right or impacts upon an "inherently suspect" group, it will be subjected to strict scrutiny and will be set aside unless it is justified by a compelling state interest. (Internal citation omitted). Franklin v. Berger, supra 595. On the other hand, where the classification at issue neither impinges upon a fundamental right nor affects a suspect group "it will withstand constitutional attack if the distinction is founded on a rational basis." Id.
In the context of the re-committee's claims, the liberty interest in freedom from restraints is the interest being impacted upon.
Although an argument can be made that the liberty interest in freedom from restraint is a fundamental right, no case has expressly held as such. In Heller v. Doe, the United State's Supreme Court analyzed the freedom from restraint under the rational basis analysis, primarily because the parties in the lower courts never argued for a heightened level of scrutiny. Heller v. Doe, 509 U.S. 312, 125 L.Ed.2d 2357, 113
CT Page 11275 S.Ct. 2637 (1993). Since this court finds that the statute in question, General Statute § 17a-593 (c), fails under even rational basis scrutiny, there is no need to determine whether or not the freedom from restraint is a fundamental right.
The classification of the group to which the re-committee belongs, those persons committed to a mental hospital due to mental illness, a "disability" which could be considered to be a classification based upon an "inherently suspect" group.
However, as recently as 200 1, the United State's Supreme Court has held that the disabled are not part of an "inherently suspect" group under federal equal protection analysis. Board of Trustees, University ofAlabama v. Garrett, 531 U.S. 356, 365-366, 121 S.Ct. 955, 148 L.Ed.2d 866
(2001); Cleburne v. Cleburne Living Center, Inc., 473 U.S. 432,105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). Since federal authority does not provide for heightened scrutiny in the context of the commitment of acquittees, this court will apply the "rational basis" test. Bd ofTrustees v. Garrett, supra, 531 U.S. 367.
1. Rational Basis Analysis Under the Federal Constitution.
In the context of an equal protection challenge to social and economic legislation that does not infringe upon a fundamental right or affect a suspect group, the classification drawn by the statute will not violate the equal protection clause if it is rationally related to a legitimate public interest, the "rational basis" test (Citations omitted). CityRecycling, Inc. v. State, 257 Conn. 429, 445, 778 A.2d 77 (2001). In general, the equal protection clause is satisfied so long as there is a plausible policy reason for the classification . . . the legislative facts on which the classification is apparently based rationally may have been considered to be true by the government decision maker . . . and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational . . . (citation omitted; internal citations omitted). Id., 445-46.
This court is of the opinion that this is not the appropriate test in light of this court's belief that the right to freedom from confinement is a fundamental right to liberty in the circumstances of the instant matter. However, the court will analyze this standard because 1) there is currently no precedent from the U.S. Supreme Court clarifying that freedom from confinement is a fundamental right; 2) the mentally disabled are not part of an "inherently suspect" class and 3) a rational basis for the disparate treatment was posited by the state. CT Page 11276
When the legislature sets in place statutes which treat similarly situated individuals differently, this differentiation in treatment will survive equal protection attack if a rational reason for the disparate treatment exists.
"The relevant inquiry under the rational basis analysis is whether the classification and disparate treatment inherent in the . . . legislation bears a rational relationship to a legitimate state end and is based on reasons related to the accomplishment of the goal. . . . TheFourteenth
Amendment to the U.S. Constitution does not deny to states the power to treat different classes of persons in different ways. . . . The equal protection clause of that amendment does, however, deny to states the power to legislate that different treatment be accorded to persons placed by a statute into different classes on the basis of criteria wholly unrelated to the objective of that statute. A classification must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike." (Citations omitted). Golden v. Johnson Memorial Hosp., Inc.,66 Conn. App. 518, 540-41, 785 A.2d 234, cert. denied 259 Conn. 902
(2001).
This court does "recognize the principle that the legislature has broad discretion in the exercise of its power to enact legislation and that its judgment in establishing statutory classifications will be set aside only where no grounds can be conceived to justify them. (Citations omitted)."State v. Reed, 192 Conn. 520, 531, 473 A.2d 775 (1984).
"The distinctions drawn by a challenged statute must bear some rational relationship to a legitimate state end and will be set aside in violation of the equal protection clause only if based on reasons totally unrelated to the pursuit of that goal." (Citation omitted). Id.
a. The character of the classification.
In order to determine whether a particular classification violates the guarantees of equal protection the court must first consider "the character of the classification".
The analytical predicate of consideration of an equal protection claim is a determination of who are the persons who comprise the respective classifications — who are the persons similarly situated. (Citations omitted). City Recycling, Inc. v. State, supra, 448.
To implicate the equal protection clauses under state and federal CT Page 11277 constitutions, therefore, it is necessary that the state statute in question, General Statute § 17a-593 (c), either on its face or in practice, treats persons standing in the same relation to it differently.
The re-committee has articulated two similarly situated classes of individuals who, the re-committee claims, are treated differently under the respective statutes.
The first class includes the re-committee, it includes all those persons who were found not guilty of a criminal offense due to mental disease or defect and who have served the maximum period of commitment, and are under petition of the state for a re-commitment for an additional period of confinement. This class of individuals is under the sole jurisdiction of the Board and the procedures applicable to the Board.Franklin v. Berger, supra, 591, General Statute § 17a-582.
The second class of individuals includes those persons who were convicted of crime (s), sentenced to the custody of the commissioner of corrections to serve a period of incarceration, and during their sentence were committed to a hospital for mental health reasons. This class of individuals is under the jurisdiction of the Probate Court and the procedures applicable to those individuals civilly committed. General Statute § 17a-515.
Both classes of persons have been adjudicated to have committed their respective crimes beyond a reasonable doubt.[20]
Both classes of persons have had their liberty taken away and are confined for the same reasons: that each has been found to be mentally disabled to the extent that discharge from custody would present a danger to themselves and/or others.
As a general matter, the confinement of insanity acquittees, although resulting initially from an adjudication in the criminal justice system, is not "punishment" for a crime. The purpose of commitment following an insanity acquittal, like that of civil commitment, is to treat the individual's mental illness and protect him and society from his potential dangerousness. The committed acquittee (re-committee) is entitled to release when he has recovered his sanity or is no longer dangerous. . . . As he was not convicted, he may not be punished. His confinement rests on his continuing illness and dangerousness. (Citations omitted). Payne v. Fairfield Hills Hospital, supra, 683-84. Similarly the commitment of a person convicted of a crime, after the expiration of their period of incarceration is not punishment. The ultimate purpose in having a convicted person civilly committed is to treat the individuals CT Page 11278 mental illness and protect him and society from his potential dangerousness.
In fact, these two classes of individuals are sufficiently similarly situated to the extent that our Supreme Court has found that "After the expiration of a maximum term of confinement (for the re-committee), it is difficult to find a constitutional justification for a categorical distinction between an insanity acquittee and an incarcerated prisoner who was transferred to a mental hospital while he was serving his criminal sentence. In each instance, the purpose of commitment `is to treat the individual's mental illness and protect him and society from his potential dangerousness'." (Citations omitted). State v. Metz, supra, 424.
Therefore this court takes the position that the two classes of individuals are similarly situated for equal protection analysis.
b. The individual interest affected by the classification.
As a result of being categorized as a re-committee under the jurisdiction of the Board, the re-committee's private liberty interest is affected by said classification in that the re-committee is, inter alia, not accorded the right to periodic judicial review which protection is accorded to those individuals similarly situated and classified as committed convicts under the jurisdiction of the Probate Court.
The classification results in disparate treatment of the re-committee's liberty interest.
There are a variety of ways that the two classes are treated differently by the respective set of applicable statutes, including the procedure used relevant to the original commitment, the manner in which the commitment is reviewed, the manner in which the commitment is extended beyond any maximum term for the offense, the manner of discharge, and the penalties imposed on each class should the committee abscond from their respective place of commitment.[21]
c. The Governmental Interests.
This court must next consider "the governmental interests asserted in support of the classifications."
The governmental interest in the continued confinement of individuals who are mentally ill and a danger to themselves or others is not contested. It is a governmental interest that is reasonable and CT Page 11279 appropriate.
The government's interest in the continued confinement of individuals who are mentally ill and a danger to themselves or others is the same whether the person is a committed acquittee or a committed convicted person whose sentence, after commitment, has expired.
d. Differential Treatment Rationally Related to Legitimate PublicInterest
At argument[22] the state provided a reason for the different treatment of the two articulated classes of individuals. The state posited that in the case of the commitment of the re-committee, the criminal conduct of the re-committee was related to his mental illness. This set of circumstances, in the opinion of the state, makes the re-committee much more dangerous[23] than a convicted prisoner who is committed civilly. The state claims in the case of the convicted prisoner the mental illness is not related to his criminal behavior. In the case of the convicted and incarcerated individual who demonstrates mental illness while serving his sentence, the criminal conduct and the mental illness, claims the state, are unrelated and no court has determined a nexus between the illness and the crime. In the opinion of the state this distinction makes the re-committee a more dangerous individual, and therefore, posits the state, there is a reason to treat the re-committees differently than civilly committed prisoners.
Prior to the acquittee's completing his initial maximum period of commitment this difference is recognized and accepted as a reason to treat acquittees differently than the individual sought to be civilly committed.
The court in Metz began its analysis with the proposition that the two classes of individuals articulated by the re-committee were constitutionally similarly situated. However, based upon the latent ambiguity of the statute, the Supreme Court articulated a "point of demarcation" — once the maximum period of commitment had been reached — for the purposes of the burden of proof and burden of production, there was no reason to treat the re-committee different from the individual who is committed civilly and under the jurisdiction of the Probate Court. State v. Metz, supra, 422.
The Supreme Court's declaration of the "point of demarcation" is significant in that it allowed our highest court the opportunity to accord the insanity re-committee greater protections commensurate with those protections previously enjoyed by acquittees under the predecessor acts[24], and currently only enjoyed by those individuals civilly CT Page 11280 committed. "The considered view of professional commentators who have promulgated model rules for the commitment of the insanity (re-committees) is that, after expiration of a stated term of commitment, fairness, convenience and symmetry require an insanity (re-committee) to be treated like others committed for mental illness." (Citations omitted). State v.Metz, supra, 422.
Our Supreme Court held that once the maximum period of commitment had been reached, the "dangerousness" component of being committed expired. Our Supreme Court found that "(t)hese constitutional concerns leads us to construe the maximum period of commitment authorized by § 17a-582 (e) (1)(A) as a reasonably identified point of demarcation beyond which the presumption of dangerousness initially accompanying an acquittee does not continue . . ." Id., 425.
The position advanced by the state presumes the dangerousness of the re-committee. In accordance with Metz, that presumption of dangerousness lapses when the acquittee has attained the maximum period of confinement available for the offense for which he was adjudicated "not guilty". Mr. Long has long ago passed the "point of demarcation" — the five year anniversary of his initial confinement — the maximum possible sentence for assault in the second degree, a D felony. Therefore, there is no longer a presumption of dangerousness.
Other than the "presumption of dangerousness" basis posited by the state and rejected by this court, no other governmental interest in support of the disparate classifications has been asserted nor could any be discerned from the record.
This court finds that the re-committee has an individual liberty interest affected by his classification, there is no "constitutional justification for a categorical distinction" between the classifications, and there is no governmental interest in support of the disparity of the classifications. Accordingly, there is no "rational basis" ground to support the disparate treatment of the re-committee.
2. Strict Scrutiny Analysis Under Art. I, Sec. 20 of ConnecticutConstitution.
The final argument of the re-committee is that General Statute §17a-593 (c) violates his rights under the equal protection clause of the Connecticut Constitution.[25] Under the Connecticut Constitution, the re-committee claims, state action denying equal protection to an individual with a mental illness, such as the re-committee, must survive a "strict scrutiny" test. The state action effecting similarly situated CT Page 11281 individuals with mental illness differently, the re-committee continues, must survive strict scrutiny analysis in order for the state action to be valid. The re-committee asserts that the equal protection clause of the Connecticut Constitution provides more expansive protection than the re-committee has under the federal constitution. Although the minimum protections to be accorded the citizens of this country are defined by the U.S. Constitution, a state can provide greater protection to its citizens than provided by the federal charter. State v. Joyce, 229 Conn. 10, 16,639 A.2d 107, U.S. Cert. Denied 523 U.S. 1077, 118 S.Ct. 1523,140 L.Ed.2d 674 (1994).
It was indicated that the state and federal equal protection clauses would be treated simultaneously as the provisions have "the same meaning and limitations," and in general both the state and the federal clauses are understood to provide the same protections to their respective citizens. However, "(W)e have interpreted the equal protection provisions of the state constitution differently than that contained in the federal constitution, particularly when the distinctive language of our constitution calls for an independent construction." (Citations omitted). Daly v. DelPonte, 225 Conn. 499, 513, 624, A.2d 876 (1993).
In our inquiry we must focus on Article I, Section 20 of our state constitution. Article I, Section 20 as amended by the twenty-first
amendment of the Connecticut Constitution provides:
 "No person shall be denied the equal protection of the law nor be subjected to segregation or discrimination in the exercise or enjoyment of his or her civil or political rights because of religion, race, color, ancestry, national origin, sex or physical or mental disability. Conn. Const. amended XXI." (Emphasis added).
In Daly v. DelPonte, supra, our Supreme Court reviewed the state constitution, Article I Section 20, as amended, and held that its explicit prohibition of discrimination because of physical[26] or mental disability defines a constitutionally protected class of persons whose rights are protected by requiring encroachments on these rights to pass a strict scrutiny test. Daly v. DelPonte, supra, 513-14.
Where the classification impinges upon a fundamental right or impacts upon an "inherently suspect" group, it will be subjected to strict scrutiny and will be set aside unless it is justified by a compelling state interest. (Citations omitted). Franklin v. Berger, supra, 595. CT Page 11282
Our Supreme Court concluded that "amendment twenty-one's protection for those possessing physical and mental disabilities identifies the members of this class as a group especially subject to discrimination and requires the application of the highest standard of review to vindicate their constitutional rights (T) hat standard requires strict scrutiny of the challenged government action." Daly v. DelPonte, supra, 515. Based on the twenty-first amendment of the Connecticut Constitution, persons suffering from mental disabilities cannot be denied the equal protection of the law. The re-committee is such a person, having been adjudicated to have a mental illness by a court. Therefore, state action treating the re-committee differently than others with mental illness must be reviewed under strict scrutiny analysis. Id.
Strict scrutiny analysis requires state action resulting in unequal treatment to be justified in two particulars. State action can survive constitutional scrutiny only if it 1) serves a compelling state interest, and 2) is narrowly tailored to serve that interest. (Citation omitted). Daly v. DelPonte, supra, 515.
In this case the re-committee does not contest that the state's asserted interest in confining those individuals who are mentally disabled to the extent that their discharge would pose a danger to others is a compelling state interest.
The issue before this court relevant to the standard as it applies to Art. I, Sec. 20 as amended is, therefore, whether the action taken by the legislature was sufficiently narrowly tailored to serve the state's interest in confining the mentally ill who are dangerous.
"[T]he state may well have a compelling interest in the continued commitment of acquittees whose mental illness makes them dangerous to themselves or others." State v. Metz, supra, 425. However, the procedures in place allowing the re-commitment of an acquittee after the expiration of the maximum term of commitment are not narrowly tailored to serve that interest. The state has made no claim that the procedures have been narrowly tailored to Mr. Long, the re-committee. "If there are other, reasonable ways to achieve a compelling state purpose with a lesser burden on constitutionally protected activity, a state may not choose the way of greater interference. If it acts at all, it must choose `less drastic means'. Attorney General of N.Y. v. Soto-Lopez, 476 U.S. 898,909, 106 S.Ct. 2317, 90 L.Ed.2d 899 (1986). In this instance, a less drastic means for the commitment of re-committees beyond their maximum term of commitment is readily available and utilized by the state in the case of persons convicted of crimes, who are serving their sentence and are committed civilly and avail themselves of the civil protections. The CT Page 11283 differences in the treatment of committed convicts (under the jurisdiction of the Probate Court wherein civil commitment procedures are applicable) and re-committees (under the jurisdiction of the Board wherein Board commitment procedures are applicable) demonstrates that a less drastic means is available which will fulfill the state's compelling need while simultaneously not placing a greater burden on the constitutional rights of the re-committees. At the time of the initial commitment of the acquittee the court's authority to commit the acquittee is limited to a period of time "not to exceed the maximum sentence that could have been imposed if the acquittee had been convicted of the offense." General Statute § 17a-593 (e)(1)(A). However, upon re-committment, there is no statutory limitation. The court has statutorily unlimited discretion to re-commit the acquittee. When an acquittee is re-committed, there is no limitation to the period of time a re-committee could be confined. In other words, although the Board, in the matter herein, recommended to the court an extension of the re-commitment period to a term of three (3) years, this court has the authority to extend the re-commitment period for any arbitrary period of time, without standards or guidelines, say for a period of thirty (30) years. Incredibly, during this hypothetical re-commitment order for a period of thirty (30) years there is no ongoing periodic judicial review of the re-commitment, Jones v. United States,463 U.S. 354, 103 S.Ct. 3043, 77 L.Ed.2d 694 (1983). The commitment procedures utilized when the state seeks to re-commit an acquittee under General Statute § 17a-593 (c) render the maximum period of commitment in General Statute § 17a-582 (e)(1)(A) "a nullity". State v. Metz, supra 421.
The procedures articulated in General Statute §§ 17a-495 through17a-528, the civil commitment statutes, are more narrowly tailored to serve the state's compelling interest.
There currently exists in Connecticut two different ways that the state can have an individual who suffers from a mental illness and is considered dangerous to himself or herself or others, committed to a mental hospital. The first, the civil commitment procedures, includes numerous ways to ensure that the liberty of the mentally ill person is not taken away improperly, and that the continued commitment is justified, ensured by periodic judicial review of the commitment. The second, the re-commitment of acquittees after the maximum period of commitment, does not include those necessary, procedural protections to ensure that the continued commitment is justified. This court is of the opinion that the use of the Board procedure to re-commit acquittees beyond the maximum period of commitment is not narrowly tailored to pursue a compelling state interest. CT Page 11284
Therefore, this court finds that the re-committee has proven that General Statute § 17a-593 (c) allowing the state to pursue re-commitment of a re-committee beyond the period of maximum commitment, violates the equal protection clause of Art I, Section 20, as amended, of the Connecticut Constitution.
 VI. CONCLUSION
In 1977 Ms. Fasulo and Ms. Barberie[27] cried out for fairness and claimed that they were involuntary committees who were denied due process of law — our Supreme Court agreed.
In 2002 Mr. Long cries out for fairness and claims that he is an. involuntary committee who is denied due process of law and advances thesame argument as articulated by Ms. Fasulo and Ms. Barberie and this court agrees; and he further claims he is denied the equal protection of the law and this court agrees.
Ours is an easy task. As Justice Potter Stewart of the United States Supreme Court said simply, "Fairness is what justice really is."[28]
Abraham Lincoln said it a bit more eloquently, "These men ask for just the same thing fairness and fairness only. This, so far is in my power, they, and all others, shall have."[29]
The court finds that General Statue § 17a-593 (c) violates the re-committee's right to due process of law under Article I, § 8 of the Connecticut Constitution and the re-committee's right to equal protection of the law under the 14th Amendment to the U.S. Constitution and Article I, § 20 of the Connecticut Constitution.
It is with the utmost reluctance and with due deliberation that this court declare an act of the legislature unconstitutional. But our law, the facts of this case, and the interests of fairness demand such a finding. The re-committee has carried his heavy burden and has proven to this court the unconstitutionality of General Statute § 17a-593 (c) beyond a reasonable doubt.
Accordingly, the re-committee's Motion to Dismiss the Petition for Commitment is GRANTED. The re-committee's Motion to Strike the Report of the Psychiatric Review Board is DENIED.
The re-committee is to be held for a period of 60 days from the date of the filing of this memorandum to allow the state, if it so elects, to pursue a petition for civil commitment before the Probate Court. CT Page 11285
It is so Ordered.
 ___________________, J. Miano